**SO ORDERED.**

**SIGNED this 27 day of March, 2007.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LEJUERRNE DEVELOPMENT | ) | Case No. 04-12218 |
| CORPORATION, | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| CARL B. DAVIS, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 06-5218 |
| | ) | |
| SHERRIE A. TUCKER, | ) | |
| SHELLY S. ANDERSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Trustee Carl Davis seeks to avoid the transfer of a remainder interest in a residence by LaJeurrne Development Corporation (LDC), the debtor, to defendant Sherrie Tucker and Tucker's

1

subsequent transferee, Shelly Anderson. Proceeding under authority of § 544(b), the trustee invokes the Statute of Elizabeth, KAN. STAT. ANN. § 33-102, asserting that the transfer was made with intent to hinder, delay or defraud LDC's creditors. The trustee also proceeds under KAN. STAT. ANN. § 33-204 and § 33-205, sections of the Uniform Fraudulent Transfer Act ("UFTA") as adopted in Kansas. The defendants deny that the transfer in question was fraudulent and, in any event, claim the various defenses afforded by KAN. STAT. ANN. § 33-208. This matter came to trial on December 19, 2006, at which time the Court heard testimony, admitted exhibits, and received several stipulations. The trustee appeared by special counsel, Martin J. Peck, and the defendants appeared by their counsel, J. Michael Morris. After carefully considering the evidence, the Court is now ready to rule.

Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).

Findings of Fact

LDC was a Kansas corporation that developed residential real estate and owned and operated a Super C convenience store in Wellington, Kansas. Richard and Carol LeJuerrne were the sole shareholders of LDC. LDC filed its chapter 7 petition on April 26, 2004. Two other LeJuerrne enterprises have previously been debtors in cases in this Division, as has Mr. LeJuerrne himself.[1] According to Richard's testimony, LDC was the one business that sustained the others in the 2001-2002 period. Carol essentially ran the convenience store business. Her efforts to preserve it make

---

[1] *In re Halibrand Engineering Corporation*, No. 01-14684-11 filed September 28, 2001; *In re AvCentral, Inc.,* No. 02-11525-7 filed April 29, 2002; *In re Richard J. LeJuerrne*, No. 02-14863-7 filed September 26, 2002.

up part of the story in this matter.

Defendant Sherrie Tucker is Carol LeJuerrne's mother. Shelly Anderson is Richard and Carol's daughter and Tucker's granddaughter. Tucker lives in a home built on real estate situated in the Shadybrook Addition to Wellington that is the subject of this action. In 1992, apparently as a way of financing the construction of her home, Tucker acquired a life estate in this tract from LDC and LDC retained a remainder interest in it.[2] Under the instrument creating this arrangement, Tucker paid LDC $64,500 consisting of a gift of $20,000 from the LeJuerrnes, a loan from them of $23,500, and $21,000 from the sale of Tucker's then-existing home.[3]

In December of 2001, the LeJuerrnes obtained an appraisal of the remainder interest from their accountant, Lonnie Cooper. Mr. Cooper opined that, applying the actuarial tables established in the Internal Revenue Service Regulations, the remainder could be valued at $60,341, based upon an appraisal of the full property at $114,600.[4] The market value placed on the remainder interest by Mr. Cooper referred to a value acceptable to the IRS for estate and gift tax purposes. Richard testified that when he received this appraisal, he applied his own knowledge as the builder of the home and developer of the subdivision to determine that a fair price for the remainder would be $30,000. The remainder interest was carried at $33,342 on the books of LDC.

By January of 2002, creditors had begun collection activity against other LeJuerrne entities, Halibrand Engineering, Inc. and AvCentral, Inc.[5] LDC was not a party to either of these

---

[2] Ex. 2.

[3] Ex. 1.

[4] Ex. 3.

[5] Ex. 11 and 12.

3

proceedings. The LeJuerrnes caused LDC to sell the remainder interest to Tucker for $30,000 in January, 2002. Tucker's check in that amount dated January 7, 2002 was written to Shelly Anderson, not LDC.[6] Tucker received a deed for the remainder and, with that, she became the owner of the home in fee simple. It does not appear that the home was encumbered in any way. LDC's deed was executed by the LeJuerrnes on January 10, 2002. On the same day, Tucker made a deed conveying the property to herself and Shelly Anderson, but retaining a life estate. Both deeds were recorded January 11, 2002.[7] She testified that she did this to assure that Shelly would receive the property when Sherrie died and in anticipation of the assistance that Shelly, who is a nurse, would afford Sherrie in her twilight years.

Tucker testified that she had recently retired and the money came from her savings and represented her effort to assure herself of a paid-for residence in her latter years.[8] She denied that the LeJuerrnes told her of any financial problems that LDC was having. In any event, Tucker's $30,000 check was deposited by Shelly into a personal account in her and her husband's name at Intrust Bank, account #6970. Richard was forthright that the LDC sale of the remainder was an effort to cash out an unencumbered asset for the benefit of LDC's business.

By January 10, 2002, some of the LeJuerrne entities were already in foreclosure. Fidelity Bank had begun an earnest pursuit of Halibrand Engineering, Inc., which led to Halibrand's filing of a chapter 11 case in late September 2001. Cornerbank had commenced a mortgage foreclosure action against AvCentral in November, 2001. Five months later, AvCentral filed its chapter 7

---

[6] Ex. 7.

[7] Ex. 9 and 10.

[8] The Court heard no evidence regarding Ms. Tucker's age or the status of her health.

petition. LDC was not, however a defendant in any suit, nor had any demand been made on it, at the time of the remainder transfer. LDC was substantially indebted to Security State Bank but according to Richard, was not in default on its obligations at the end of 2001. He indicated that LDC's loans were on the Bank's "watch list."

On January 21, 2002, after the sale and transfer to Tucker, the Bank called its notes. The Bank commenced a foreclosure case in Cowley County District Court the next day. The parties stipulate that on January 10, 2002, LDC was insolvent.

Carol LeJuerrne testified that, during this period, she maintained separate accounts in Wichita in her name and in Shelly's to sequester funds she needed to keep LDC going. One of these accounts was established at Intrust Bank, account #8088. Another account was established at Cornerbank, account # 7378 in the name of the Carol LeJuerrne Revocable Trust. She stated that, while she maintained an LDC operating account in Wellington, the only items drawn on it were payroll checks and payments to vendors. In particular, her fuel vendor would draft the Wellington account and, as business difficulty mounted, she worked with that vendor to draft only what was in the Wellington account to pay for the gas the convenience store received. She maintained the Wichita accounts to set aside and preserve funds to pay LDC's property taxes and secured creditors claiming liens on LDC's operations when they came due.[9] These included the SBA and Hillcrest Bank.

The evidence showed that after Shelly deposited the $30,000 check into her personal Intrust

---

[9] Carol also testified that she instructed Tucker to make the $30,000 check for the remainder interest payable to Shelly. Although no direct explanation for this was given, the Court infers that this was part of Carol's method to preserve these funds for certain LDC obligations and to avoid the risk of those funds being spent if run through LDC's account in the ordinary course.

5

account # 6970, she later withdrew $45,000 therefrom and deposited it in Intrust account # 8088, the account set up in Carol's and Shelly's name.[10] Similarly, Shelly deposited funds from her personal account # 6970 into the Cornerbank account. Indeed, during 2002, at least $55,200 was deposited from account # 6970 to these accounts. And, nearly $60,000 was expended from those accounts to pay mortgage payments to Hillcrest Bank, the note holder on the convenience store, property taxes, attorneys fees, appraisal fees, and other LDC expenses.

At the heart of this controversy is whether LDC, in transferring the remainder interest, was attempting to shield an asset from the reach of creditors, as the trustee contends, or whether it was attempting to legitimately generate cash from an asset to pay its creditors and keep its business afloat, as the debtor contends. The Court specifically notes that while Carol LeJuerrne's cash management methods were admittedly unorthodox, her testimony was forthright and credible.

Conclusions of Law

11 U.S.C. § 544(b)(1) incorporates state fraudulent conveyance law into bankruptcy proceedings.[11] Here, the trustee invokes Kansas law on the Statute of Elizabeth[12] and the UFTA.[13] To prevail on either the Statute of Elizabeth claim or the claims raised under the UFTA, the trustee

---

[10] The trustee's counsel points out that some ten (10) months elapsed between the $30,000 deposit into Shelly's account before the $45,000 was withdrawn and deposited into Intrust account # 8088.

[11] *See In re Moss*, 258 B.R. 405, 425 (Bankr. W.D. Mo. 2001) *citing Blackwell v. Lurie (In re Popkin & Stern)*, 223 F.3d 764, 769 n.11 (8th Cir. 2000); *Gaddis v. Allison*, 234 B.R. 805, 811 (D. Kan. 1999).

[12] KAN. STAT. ANN. § 33-102 (2000) is based upon the 16th century Statute of Elizabeth, 13 Eliz. Ch. 5 (1570).

[13] KAN. STAT. ANN. § 33-204 and § 33-205 (2000) codify the UFTA. The UFTA was enacted in Kansas in 1998 and became effective January 1, 1999. *See* KAN. STAT. ANN. §§ 33-211 and 212.

6

must make his case by a preponderance of the evidence. The quality of the proof must be clear and convincing.[14] Using these standards, we address each of the trustee's three claims in turn.

### A. Intent to Hinder, Delay or Defraud: KAN. STAT. ANN. § 33-102 and KAN. STAT. ANN. § 33-204(a)(1).

To prevail on a Statute of Elizabeth claim, the trustee must demonstrate that the transfer was made with (1) intent to hinder, delay or defraud; and (2) that the grantee participated in the scheme with knowledge of it or of facts and circumstances that would place the grantee on notice of it.[15] Because this case involves what are essentially intra-family transactions, the burden of the trustee is somewhat lighter: those transactions are usually exposed to a higher level of scrutiny than ones among strangers.[16] Kansas case law recognizes six badges of fraud under the Statute of Elizabeth. They are: (1) a relationship between grantor and grantee; (2) grantee's knowledge of litigation against the grantor; (3) insolvent grantor; (4) grantee's belief that asset transferred was grantor's last asset subject to execution; (5) inadequate consideration; and (6) transaction consummated contrary to normal business procedures.[17] Case law also makes clear that these badges do not necessarily weigh equal, that some are more damning than others, and that the existence of a badge is not, in itself, incompatible with good faith in fact.[18]

---

[14] *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 106, 716 P.2d 180 (1986) (fraudulent conveyance under KAN. STAT. ANN. § 33-102); *McCain Foods USA, Inc. v. Central Processors Inc.,* 275 Kan. 1, 13, 61 P.3d 68 (2002) (fraudulent transfer under the UFTA § 33-201 *et seq.*); *Newell v. Krause*, 239 Kan. 550, 557, 722 P.2d 530 (1986).

[15] *Wittman v. Henry (In re Kennedy)*, 118 B.R. 792 (D. Kan. 1990); *Koch Engineering Co. v. Faulconer*, *supra*.

[16] *Stephenson v. Wilson*, 147 Kan. 261, 265, 276, 76 P.2d 810 (1938).

[17] *Credit Union of America v. Myers*, 234 Kan. 773, 778, 676 P.2d 99 (1984).

[18] *Koch Engineering Co., supra* at 107.

7

The UFTA counterpart as codified at KAN. STAT. ANN. § 33-204(a)(1) has a similar focus.[19] Eleven badges of fraud, similar in tenor to those developed in the case law on the Statute of Elizabeth, are listed in KAN. STAT. ANN. § 33-204(b). Again, these are circumstances to be considered and not necessarily a formula for concluding that a fraudulent transfer has occurred.

After hearing the testimony and studying the evidence, the Court is not convinced that an intent to hinder, delay or defraud creditors attended either LDC's transfer of the remainder to Tucker or Tucker's transfer of the fee to herself and Anderson. Nor did Tucker and Anderson participate in or have knowledge that the transfers were part of a fraudulent scheme on the part of LDC. It is true that the transfers were made to, and by, insiders. It is also true that LDC was insolvent at the time of the transfers.

But the evidence simply does not support a conclusion that the transfer was made for vastly insufficient consideration. The "appraisal" information entered into evidence simply shows that the "tax" value of the remainder was $60,000 while the cash that was exchanged only amounted to $30,000. From the Court's experience, fractional future interests in land are worth a good deal less on the open market, particularly to strangers. Moreover, apart from evidence that Tucker was a retired secretary, the Court heard no evidence concerning her age or her health, factors that would influence the fair market value of the remainder interest. As more thoroughly discussed below, what Tucker did pay was substantial and, therefore "reasonably equivalent."

Nor was it shown that Tucker was aware of, or involved in, the debtor's business difficulties. No litigation was actually pending against debtor at the time of the transfers. Security State Bank

---

[19] *See McCain Foods, USA v. Central Processors, Inc.*, 275 Kan. 1, 61 P.3d 68 (2002) (Cases decided before the adoption of the UFTA are instructive in recognizing the relationship between badges of fraud and proof necessary to support a finding of fraud.).

8

had not made demand upon LDC. While the Security State Bank petition that was filed against LDC *after* the transfers alleges that debtor was in default of its loan obligations to the Bank, it is not apparent when LDC went into default.[20] Richard LeJuerrne disputed that LDC was in default as of December 2001. In any event, there was no evidence presented that Tucker was aware of any of this.

Nor did the trustee adduce evidence that Tucker believed this to be the last available asset of LDC. Indeed, Security State Bank's petition against LDC suggests that several tracts of real estate owned by LDC existed.[21] Richard LeJuerrne testified that he continually worked with Security State Bank to sell off lots and pay down the Bank debt during the applicable period.

While Tucker's payment for the remainder interest to Shelly rather than LDC was unconventional, Carol's explanation was plausible in light of the other bookkeeping methods employed by her to sequester funds for certain creditors and obligations. Moreover, the balance of the transaction was essentially transparent. Deeds changed hands and were promptly recorded, affording all creditors of constructive notice of the transfers. All of the consideration found its way into the hands of debtor's principal secured creditors. The payment of the remainder's sale proceeds to an account other than LDC's is no doubt galling to the trustee and the motivating creditor, the Security State Bank. Had those funds been secreted by the debtor, the Court would be a good deal more suspicious. Here, however, Carol LeJuerrne credibly testified that she used this money to pay obligations and expenses of the debtor. She kept the money in a different account to insure that it

---

[20] *See* Ex. 13, ¶¶s 39, 66, 74 alleging default by LDC but not specifying the nature of or time when LDC went into default.

[21] *See* Ex. 13, ¶ 93.

9

would not be absorbed by suppliers or vendors and she could use it to pay LDC's secured debt. There is a qualitative difference between a business taking measures to insure its survival and fraud. This case is an example of the former, not the latter.

### B. Reasonably Equivalent Value: KAN. STAT. ANN. § 33-204(a)(2) and 33-205(a).

The trustee also seeks to avoid the transfer under KAN. STAT. ANN. § 33-204(a)(2), the constructive fraud provision, arguing that the debtor did not receive reasonably equivalent value for the remainder. What is reasonably equivalent is a question of fact.[22] Its determination is not formulaic. Instead, a Court must consider what market value is, considered in concert with the nature of the property and its relative marketability. Here, the debtor sold a remainder interest that would not ripen to a possessory interest in the Tucker home until Tucker's death. The only valuation evidence is an accountant's contemporaneous determination that, based upon Internal Revenue regulations (which are in turn based on actuarial considerations and a set inflation rate), the remainder was worth approximately 52 per cent of the value of the fee. That calculation yielded a value of $60, 341.

The evidence is that Tucker paid $30,000 cash for the remainder. The only evidence as to marketability was Jerry Munson's appraisal in 2001, finding the entire fee to be worth $114,600 and a broker's statement that the entire Shadybrook property might bring $95,000 to $100,000. The parties stipulated that realtor Cathy Short would have testified that there is no ready market in Wellington for remainder interests. The remainder interest was carried on debtor's books at

---

[22] *Stillwater National Bank and Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626 (10th Cir. BAP 2003) (In determining whether debtor received reasonably equivalent value, bankruptcy court should compare the value transferred with the value received in exchange for the transfer)

10

$33,000. In these circumstances, the Court cannot conclude that $30,000 is less than "reasonably equivalent value."

KAN. STAT. ANN. § 33-205(a) speaks to transfers made for less than reasonably equivalent value while the debtor is insolvent. These transactions are avoidable as to pre-transfer creditors only. LDC's creditors, including Security State Bank, held claims before and after the transfer. The same analysis pertaining to reasonably equivalent value set out above applies here.

Conclusion

The trustee failed to carry his burden to demonstrate that the transfer of the remainder interest by LDC to Sherrie Tucker should be avoided under any theory pled in this matter. Therefore, JUDGMENT should be entered FOR DEFENDANTS, Sherrie Tucker and Shelly Anderson, and costs taxed to the trustee. A judgment on decision shall issue this day.

# # #

11

Case 06-05218    Doc# 27    Filed 03/27/07    Page 11 of 11